ADAM GORDON
United States Attorney
MARK S. LAURICELLA
Assistant United States Attorney
New York Attorney No. 5440623
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619)546-9305
mark.lauricella@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 24-CR-2391-RBM |
|---|---|
| v. | **UNITED STATES' OMNIBUS SENTENCING MEMORANDUM AS TO DEFENDANTS 1 AND 3** |
| JORGE ANCHUNDIA (1),<br>EDWIN FERNANDO BAILON CHAVEZ(3), | |
| Defendants. | Judge: Hon. Ruth Bermudez Montenegro<br>Date: February 6, 2026<br>Time: 9:00 a.m. |

The UNITED STATES OF AMERICA, by and through its counsel, Adam Gordon, United States Attorney, and Mark S. Lauricella, Special Assistant United States Attorney, hereby files its Omnibus Sentencing Memorandum as to Defendants Jorge Anchundia and Edwin Fernando Bailon Chavez. This memorandum is based upon the files and records of the case.

### INTRODUCTION

Jorge Anchundia (1) and Edwin Fernando Bailon Chavez (3) (defendants) are before the Court for sentencing after pleading guilty to Possession of Cocaine with Intent to Distribute on Board a Vessel in violation of 46 U.S.C. § 70503.

On October 18, 2024, Coast Guard Cutter HAMILTON first laid eyes on the defendants' go-fast vessel traveling in the Eastern Pacific Ocean. In a position over 512 nautical miles south from land in Acapulco, Mexico, the defendants' vessel possessed the hallmarks of narco-trafficking. It had four outboard enginges, multiple fuel barrels on deck, packages on deck, and was operating in a known drug trafficking area. The vessel was located in international waters and was suspected of being without nationality and displayed no indicia of nationality. Coast Guard Cutter HAMILTON launched its two law enforcement boats to command the defendants to stop and obtain positive control of the vessel. When queried by Coast Guard officers, the defendants claimed Ecuadorian nationality for the vessel. The United States implemted its bilateral agreement with Ecuador, and based on Ecuador's response, the vessel was treated as without nationality. The Coast Guard then conducted a full law enforcement boarding.



(Frame above shows the three defendants onboard their 35-foot open-style panga vessel on the high seas with seveveral bales of cocaine in the foreground, and the Coast Guard Cutter HAMILTON in the distance.)



(Frame above is a DEA photo that shows all the packages of cocaine that were removed from the defendants' vessel, totaling 1,710kg.)

Leading up to this point, co-defendants Jorge Anchundia, Edwin Fernando Bailon Chavez, and Jhonny Arcentales departed the littorals near Manta, Ecuador on a cocaine-laden vessel equipped with sufficient food, supplies, and navigation equipment to make the long, arduous journey across the Eastern Pacific Ocean. Along the way, they completed several at-sea refuelings which required a fleet of vessels positioned in the middle of the ocean to receive them. Once topped off with fuel, the defendants continued their approximate 2,000 nautical mile voyage until they were eventually appreheneded.

Almost a week into their journey, the Ecuadorian defendants finally reached the "ilegada" or arrival point at sea, located appriximatly 512 nautical miles offshore of

Mexico. It is here that they awaited a second vessel sent from the coastline of Mexico to receive them and conduct an "at-sea" transfer, shifting the cocaine from the vessel from Ecuador to a vessel from Mexico. This at-sea transfer represents a critical point in maritime drug smuggling, where responsibility shifts from the cartel supplying the cocaine to the cartel receiving it. To get here each of the defendants served a pivotal role on board—from sharing the responsibilities of driving the vessel, to navigation, and ensuring proper fuel and hose function. It was at this location that they were spotted



by the U.S. Coast Guard prior to the arrival of the vessel from Mexico.

Undoubtedly, maritime cocaine smuggling is complicated. The skill, experience, and coordination necessary to transport large quantities of cocaine on the high seas, on

a 35-foot open-style panga vessel is significant. Had the defendants not been stopped by the Coast Guard, their voyage transporting approximately 1,710 kilograms (3,770 pounds) of cocaine would have likely lasted over a week and required navigating at approximately 2,000 nautical miles on the open ocean. Given the length of the journey and the requirements involved, the nature and extent of their participation is significant.

As this and other events show, maritime drug smuggling is also extremely dangerous. An appropriate sentence in this case should be substantial and reflect several key sentencing principles, including the need to deter maritime drug smuggling in general, the need to deter each defendant from reoffending, and the need to protect society from the harm caused by trafficking extreme quantities of drugs. Appropriate sentencing should also discourage these ventures as they present a danger to life at sea.

As seasoned fishermen, each of the defendants were selected for—and agreed to—smuggle drugs due to their familiarity with the marine environment and their trustworthiness in carrying out the perilous task. Each possessed a lifetime of experience on the water which proved critical to operating and navigating a go-fast vessel in an environment that can best be described as austere and unforgiving. Because each of these men possess marketable skills attractive for maritime smuggling and the allure of significant financial gain from these ventures will always be there, the sentence must be sufficient to deter each from reoffending.

Furthermore, it is important for the Court to consider the need to avoid unwarranted sentencing disparities among defendants who have committed similar offenses under 18 U.S.C. § 3553(a). From 2020 to September 2025, 89 defendants have plead guilty and been sentenced for cocaine distribution onboard a vessel by Judges of the U.S. District Court for the Southern District of California. All involved being appreheneded operating their vessel on the high seas with large sums of cocaine, ranging from a low of 40 kilograms to a high of 3,000 kilograms. The average weight per case

was 1,105 kilograms of cocaine. The average sentence received by those 89 defendants was 72.94 months in custody. The present case involves 1,710 kilograms, which is about 55% more weight than the 1,105 kilogram average per case over that five year span in the U.S. District Court of the Southern District of California.

## THE GUIDELINES

### A. Calculation

Under USSG § 2D1.1(c)(1), the base offense level is 38. This is based on 1,710 kilograms of cocaine. The United States is not recommending any enhancements or reductions for role. Since this was a team evolution and the nature and extent of each defendant's participation was significant, minor role is not appropriate. There is a two-level upward adjustment since all defendants admitted to acting as either a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying controlled substances under USSG § 2D1.1.(b)(3)(C). There is a two-level downward adjustment for Safety Valve and a three-level downward adjustment for acceptance of responsibility. Each of the defendants has met the requirements for Safety Valve under USSG § 2D1.1.(b)(18) and 5C1.2. Although this was a close question for Bailon Chavez (D3) due to him minimizing his involvement and providing information that was contradictory, he has at least satisfied the minimum requirements for Safety Valve. Each is in Criminal History Category I per the PSR. There is a two-level downward variance requested for Expeditious Resolution/Full Appellate Waiver. This results in a guideline range of 108-135 months in custody.

The United States recommends a sentence of 78 months in custody for Jorge Anchundia (D1) and 84 months in custody for Edwin Fernando Bailon Chavez (D3). This accounts for the unique personal characteristics of the defendants.

### B. Recommendation

Several factors justify the Government's recommendation. First, the defendants pled guilty to possession of cocaine with intent to distribute on board a vessel. They

were tasked with transporting a vast sum of cocaine from Ecuador by sea. This coordinated voyage would take the defendants over a week to complete and would require their teamwork and distinct skillsets in navigating an open-hulled panga approximately over 2,000 nautical miles. Had their mission been successful, the cocaine delivered in Mexico would have been forwarded on to the United States and would have caused immeasurable harm to the public. In return for their trusted skill, maritime smugglers are known to be paid handsomely, often several tens of thousands of dollars if successful. In this case, the defendats had received between $3,000-$8,000 as their upfront payment, with an expected payment of $30,000 upon completion.

The sophistication, complexity, and trust involved in carrying out the offense similarly influences the Government's sentencing recommendation. The defendants acted as more than mere drug couriers, as is commonly seen in this District for land-based drug smuggling crimes. In contrast to a courier tasked with making a short drive across the border, maritime smuggling requires actual expertise. Not everybody can do it. To operate a 35-ft vessel and know where to go and what course to steer, correcting for sea and weather conditions, is a genuine skill. It is not a simple matter of plugging the coordinates into Google Maps. These vessels have no auto-pilot. Navigating a vessel over a multi-day journey and rendezvousing with other vessels at sea to refuel involves exercising judgment. Imprecision or lack of skill can cause any number of at-sea casualties, including the vessel taking on water, its motor failing, or worse.

Additionally, in contrast to land-crossings where the courier only has the drugs for a few hours, these ventures require the defendants to be trusted with the drugs for an extended period, a matter of days and weeks. As is known from investigating these cases, panga captains and crew are a trusted cohort and the cartels (on the sell and buy side) invest considerably to make these shipments possible. It would defy logic and common sense to let untrained and untrusted men guard the precious cargo in an

environment that already carries significant natural risk. It can be assumed here that the defendants were carefully vetted.

In addition, the considerable decision-making authority that the defendants possessed while at sea influences the Government's recommendation. Out in the middle of the ocean hundreds of miles from shore, the defendants were alone in protecting and safeguarding the precious cargo. No one was there to direct their movements. They had no recruiter or manager on board. They were captains of their own ship. They only had each other to rely on. They were a team. These facts demonstrate an extraordinary degree of trust, control, and expertise not seen in typical border-bust cases, weighing strongly against a role adjustment.

As mentioned, the United States does not believe an adjustment for role, either aggravating or mitigating, is appropriate. This was a team evolution and the burden rests with each defendant to demonstrate that he was substantially less culpable than the average participant. The defendant bears the burden of proving that he is entitled to a downward adjustment based on his role in the offense. United States v. Dominguez-Caicedo, 40 F.4th 938, 964-66 (9th Cir. 2022) (noting that the relevant comparators are the actual participants in the defendant's crime—not that of every hypothetical member of a typical drug trafficking organization). None have met this burden. None were less culpable than the average participant—let alone substantially less culpable. Each was inescapably critical in carrying out the task.

Finally, given the need to generally deter others, and specifically deter these defendants from the financial allure of maritime drug smuggling, it is essential that the sentence reflects the seriousness of this offense and the harm from trafficking cocaine on the high seas. Maritime drug smuggling cases are ripe for recidivism. This District and others often see repeat offenders. The incentive to make large sums of money for

trafficking drugs, compared against the relatively low risk of being caught in an expansive ocean, must be combated with the deterrence of significant sentences.

## CONCLUSION

After considering the 3553(a) factors, the United States believes the recommended sentence of 78 months in custody for Jorge Anchundia (D1) and 84 months in custody for Edwin Fernando Bailon Chavez (D3), followed by 5 years' supervised release for each defendant, no fine, and a $100 special assessment is sufficient but not greater than necessary.

DATED: January 30, 2026

Respectfully submitted,

ADAM GORDON
United States Attorney

Mark S. Lauricella
Special Assistant U.S. Attorney